UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DH2, INC., an Illinois corporation, | ) | **JUDGE SHADUR** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. **04C  0789** |
| | ) | |
| UNITED STATES SECURITIES AND | ) | |
| EXCHANGE COMMISSION | ) | MAGISTRATE JUDGE MASON |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff DH2, Inc., by counsel, files this Complaint for Declaratory and
Injunctive Relief and in support hereof alleges as follows:

### NATURE OF ACTION

1. In this action, Plaintiff DH2, Inc. ("DH2") seeks relief from the failure
of the Securities and Exchange Commission ("SEC") to comply with the requirements of
the Investment Company Act of 1940, 15 U.S.C. §§ 80a et seq. ("ICA") and the
Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. ("APA") in adopting a rule that
greatly expands the circumstances under which investment companies will depart from
using actual market prices when calculating the value of fund portfolio securities under
the ICA. Compliance Programs of Investment Companies and Investment Advisers;
Final Rule, 68 Fed. Reg. 74714, 74718 (Dec. 24, 2003) (to be codified at 15 C.F.R. pts.
270, 275, 279) ("Compliance Rule" and "Compliance Rule Release") (Ex. A hereto).

2. Certain provisions of the Compliance Rule Release direct investment
companies to calculate the value of fund portfolio securities by determining the

securities' "fair value" (i.e., an estimate of the value), if market prices for those securities

are deemed "unreliable," even if actual market prices are readily available. This change

to the valuation requirements of the ICA, while stated in the Compliance Rule Release

rather than in the text of the Compliance Rule itself, purports to declare into existence a

binding requirement with a direct economic impact on mutual funds, variable insurance

products and investors in these funds and products. This purported requirement, dictated

by the Compliance Rule Release, is referred to herein as the "Fair Value Rule." The Fair

Value Rule conflicts with the plain language of Section 2(a)(41)(B) of the ICA, which

requires that portfolio securities be valued at market prices if those prices are "readily

available." 15 U.S.C. §80a-2(a)(41).

   3. In a related release for a different rulemaking involving disclosures by

investment companies and variable insurance product issuers that was proposed at the

same December 3 open meeting of the SEC at which the Compliance Rule was adopted,

the SEC discusses the Compliance Rule Release and provides as an example of

"unreliable" prices, actual trading prices from overseas securities markets that close

earlier in the day than New York securities markets. Disclosure Regarding Market

Timing and Selective Disclosure of Portfolio Holdings, Proposed Rule, Rel.

No. IC-26287, Dec. 11, 2003, 68 Fed. Reg. 70402 (Dec. 17, 2003) (Ex. B). This second

release further demonstrates that the SEC intended the Compliance Rule Release to

impose a binding obligation to use fair valuation in a manner that conflicts with the

language of the statute.

   4. The Fair Value Rule was neither contained in nor a logical outgrowth

of the proposing release, Compliance Programs of Investment Companies and Investment

2

Advisers; Proposed Rule, Investment Company Act Release No. 25925 (Feb. 5, 2003)(68

Fed. Reg. 7038 (Feb. 11, 2003) ("Proposed Compliance Rule" and "Proposing Release")

(Ex. C). The SEC failed to give public notice of the Fair Value Rule, failed to seek or

review public comments on the Fair Value Rule, failed to develop the facts and data upon

which the alleged need for the Fair Value Rule is based, failed to consider alternatives,

failed to consider the risks and benefits of the Fair Value Rule and other alternatives, and

failed to explain the basis on which the SEC determined to adopt the Fair Value Rule

over other possible alternatives. The Fair Value Rule does not impose adequate controls

or clear standards on the conduct of "fair valuations," exposing investors in mutual funds

and variable annuities to substantial risks from improper valuations. In adopting the Fair

Value Rule, the SEC violated the APA by acting in a manner that is arbitrary, capricious,

an abuse of discretion and not in accordance with law.

## PARTIES

5. Plaintiff DH2 is and was at all relevant times an Illinois corporation

with its principal place of business in Northbrook, Illinois. DH2 is a private investment

manager and investor. DH2 employs a variety of investment strategies on behalf of itself

and its clients, including investment in, and active trading of shares of, open-end

investment companies (mutual funds) and variable insurance contracts (a type of

investment product regulated in part under the ICA).

6. The Fair Value Rule threatens the interests of investors, including

DH2. DH2 and other investors are harmed and will be harmed in the future by the SEC's

actions in expanding the circumstances under which investment companies depart from

using actual market prices and, instead, use estimates or "fair values" in the pricing of

3

portfolio securities of mutual funds in which they invest. The Fair Value Rule replaces one of the fundamental protections of shareholders in the ICA – objective valuation of portfolio assets using actual trading prices – with subjective valuation, directly impacting the pricing of mutual fund shares and variable insurance interests, having an immediate, direct, detrimental and tangible economic impact on investors in such funds. As discussed below, this action by the SEC to replace the statutory market-value standard for valuation of investment company portfolio securities and pricing of investment company shares with a non-market "Fair Value Rule" subjects DH2 and other investors to the type of abuse the ICA was designed to prevent.

7. Defendant SEC is the federal agency responsible for implementation and enforcement of the ICA and the rules promulgated by the SEC thereunder. 15 U.S.C. §§ 80a-37 – 80a-42.

## JURISDICTION AND VENUE

8. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This action concerns federal questions arising under Section 2(a)(41)(B) of the ICA, 15 U.S.C. § 80a-2(a)(41)(B), and Sections 4(a) and 10(e) of the APA, 5 U.S.C. § 706(2) and § 553(b).

9. Venue is proper in this court pursuant to 28 U.S.C. § 1391(e).

## STATUTORY FRAMEWORK AND FACTS
## GIVING RISE TO PLAINTIFF'S CAUSES OF ACTION

## STATUTORY AND REGULATORY FRAMEWORK

10. The ICA was enacted in 1940 after study and consideration by the SEC and Congress of abuses that had been associated with the operation of investment

4

companies and the offering to the public of the securities of investment companies.
15 U.S.C. § 80a-1. Among the key provisions of the ICA are those designed to eliminate
management discretion over portfolio and share valuation decisions. In its legislative
findings, Congress stated that "the national public interest and the interests of investors
are adversely affected . . . when investment companies, in keeping their accounts, in
maintaining reserves, and in computing their earnings and the asset value of their
outstanding securities, employ unsound or misleading methods, or are not subject to
adequate independent scrutiny . . . ." 15 U.S.C. § 80a-1(b)((5).

        11. Portfolio valuations serve several critical functions for investment
companies and investors. First, under the ICA, investment companies are required to
calculate the net asset value of their shares (the value of each share based on the pro rata
value of underlying portfolio assets) and use that value in calculating the price at which
new shares are issued and existing shares are redeemed or repurchased. 15 U.S.C.
§§ 80a-22, 80a-23. The value of each share is calculated by determining the aggregate
value of all of the assets in the investment company's portfolio (the value of all of the
securities holdings and other assets), subtracting liabilities and accrued expenses, and
dividing by the number of the investment company's outstanding shares. This
calculation provides the unit price to a shareholder who buys or sells. This calculation
also is used to report to investors on the current values of their investments, as well as to
determine the performance of the investment company (which information is used by
investors to compare one investment fund against another in making investment
decisions). In addition, the value of the underlying portfolio is used to calculate the

5

compensation of the investment manager and certain other service providers, who normally are paid based on a percentage of the portfolio valuation.

12. Section 2(a)(41)(B) of the ICA requires that valuations of portfolio assets be calculated as follows: "(i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) with respect to other securities and assets, fair value as determined in good faith by the [investment company's] board of directors." 15 U.S.C. §80a-2(a)(41)(B). Therefore, if market prices are "readily available" for a portfolio asset, such as a publicly traded security, the investment company must use the market price as the value; neither the directors nor managers of the investment company have the authority to use "fair valuations" (i.e., non-market estimates of values) of the portfolio assets to calculate net asset values, set share prices, report performance or prepare financial statements.

13. The APA is the federal statute governing the issuance of orders and rules by federal agencies, including the SEC. The APA empowers a reviewing court to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2). The APA also requires that a Federal agency must publish notice of proposed rulemaking before promulgating a substantive or legislative rule. 5 U.S.C. § 553(b). The APA further requires that an agency must provide opportunities for interested persons to comment through submission of written data, views, or arguments, and requires the agency to consider and address those comments in adopting a final rule. 5 U.S.C. § 553(c). A "substantive" or "legislative" rule is a rule that is intended to grant rights, impose

6

obligations, or produce other significant effects on private interests. *See National Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237-38 (D.C. Cir. 1992).

## FACTS

14. On October 25, and December 23, 2002, twelve separate formal requests were submitted by DH2's counsel, the Grippo & Elden law firm, to the SEC pursuant to the FOIA requesting documents regarding communications between the SEC and specific mutual fund and insurance companies regarding "fair value pricing" and certain other specific topics, and more generally documents in the possession of the SEC regarding "market timing," "fair value pricing," "active traders," "short term traders," and certain other specific topics. The SEC Staff responded to those requests by letters dated November 7 and 17, 2002, and February 12, March 17, March 18, March 31, and June 19, 2003. These FOIA requests and respective SEC responses are Exhibits D-O hereto. In response to certain of the FOIA requests the SEC stated that it had not located any responsive documents, and in response to certain other FOIA requests for documents relating to communications with particular mutual fund or insurance companies, the SEC provided copies of routine comment letters from the SEC Staff to those companies on certain disclosures in recently-filed fund prospectuses and registration statements.

15. On December 6, 2002, a formal request was submitted by Global Securities Information, Inc. ("GSI") on behalf of DH2 requesting from the SEC documents regarding, among other topics, "fair value pricing" "market timing" "short-term traders," "active trading." The GSI FOIA request also asked for copies of other FOIA correspondence on these topics and documents related to three SEC Staff

7

letters issued to the Investment Company Institute (ICI) on December 8, 1999, April 30, 2001, and November 14, 2002 regarding these topics. The SEC Staff summarily denied this FOIA request by letter dated December 13, 2002. The GSI FOIA request and appeal and the SEC responses are attached hereto as Exs. P-V. The Staff's December 12, 2002 letter stated that the terms "market timing" "fair value pricing" "short term traders" and "active trading" as used in the GSI FOIA request were "vague" "ambiguous," and "susceptible to different meanings." (Ex. Q). An appeal was filed on December 23, 2002 on behalf of Plaintiff with respect to the SEC's December 13, 2002 denial. (Ex. R). That appeal was granted in part (with respect to other FOIA correspondence on these topics and documents relating to the December 8 1999, April 30, 2001 and November 14, 2002 SEC Staff letters to the ICI) and denied in part by the SEC on March 12, 2003. (Ex. S). On June 12, 2003, despite the partial victory on the appeal, the SEC Staff yet again refused to provide any documents, claiming that only one such item of FOIA correspondence was located and it was subject to the "law enforcement" exemption of Subsection (b)(7)(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A), and stating also that the responsive document was also protected by Subsections (b)(4)(confidential commercial or financial information). (Ex. T). Notably, the SEC correspondence regarding the thirteen FOIA requests submitted by the Grippo & Elden law firm in October and December 2002 was not produced or disclosed by the SEC as being withheld, even though it clearly is responsive to GSI's FOIA request and does not relate to any law enforcement proceedings or contain confidential commercial or financial information. The June 12, 2003 SEC Letter did not mention or provide an explanation for the failure to provide the documents related to the three SEC Staff Letters to the ICI. The June 12,

8

2003 Letter stated that this was in "final reference" to the FOIA request. On June 26, 2003, an appeal was filed by GSI in respect of this denial. (Ex. U). The SEC acknowledged receipt of the appeal by letter dated July 11, 2003, (Ex. V). On January 23, 2004, the SEC responded to the second appeal and promised to provide copies of four FOIA letters. After passage of fourteen months since the filing of GSI's initial FOIA request, and two appeals, the SEC stated in the January 23, 2004 letter that it has conducted what it believes is a reasonable search, and that these are the only responsive documents that the staff has located at the agency. (Ex. V).

16. The SEC Staff has publicly stated on a number of occasions that it has been involved in an extensive dialog with the mutual fund industry concerning the subjects that are the topic of the Plaintiff's FOIA request, and that are the subject of the rulemaking, that are at issue in this action. *See, e.g., Hearing on Initiatives to Address Concerns in the Mutual Fund Industry Before the Senate Subcommittee on Financial Management, the Budget and International Security, and Committee on Governmental Affairs, 108th Congress* (Nov. 3, 2003) (Statement of Paul Roye, Director, SEC Division of Investment Management) (Ex. W). Yet, in spite of this extensive *ex parte* dialog between the SEC Staff and the industry that it regulates, the SEC has stated in denying Plaintiff's FOIA requests that only a handful of responsive documents exist and each of them is a FOIA request, and indicated that it does not understand the terms "market timing" "active trading" and "fair valuation" and that these terms are so vague as to be meaningless.

17. On February 11, 2003, the SEC published in the Federal Register a Proposed Compliance Rule, Proposed Rule 38a-1 under the ICA, *Compliance Programs*

*of Investment Companies and Investment Advisers*, 68 Fed. Reg. 7028 (Feb. 11, 2003)
(Ex. C). The Proposed Compliance Rule would have required each investment company
and investment adviser registered with the SEC to adopt and implement policies and
procedures reasonably designed to prevent violation of the Federal securities laws.
Neither the text of the Proposed Compliance Rule nor the Proposing Release stated or
suggested that the Proposed Compliance Rule: (1) was intended to effect a change in the
underlying substantive law to be covered by the policies and procedures; (2) was
intended to establish or change the law regarding investment company portfolio asset
valuations; (3) was intended to require investment companies to adopt policies and
procedures to "fair value" (i.e. estimate) the value of portfolio securities when market
prices for those securities are deemed to be "unreliable," even though actual market
prices for the securities are "readily available," or (4) was intended to require the
adoption of fair value pricing policies and procedures to eliminate or address "time zone
arbitrage," a type of market timing activity.

18.  On December 3, 2003, the SEC met to consider and voted to adopt the
Compliance Rule.  In his formal written remarks to the SEC at the open meeting, the
Director of the SEC's Division of Investment Management, who presented and explained
the rule to the Commission, described the new rule as, among other things, requiring that
"[f]unds must adopt fair value pricing procedures designed to eliminate the time zone
arbitrage opportunities."  Opening Statement of Paul Roye, Director, Division of
Investment Management, at SEC Open Meeting, Dec. 3, 2003, at p. 6. (Ex. X).

19.  On December 24, 2003, the SEC published in the Federal Register its
final Compliance Rule.  68 Fed. Reg. 74714 (Dec. 24, 2003) (Ex. A).  In the

10

"Background" discussion in the Compliance Rule Release, the SEC discussed the discovery by the SEC and state securities authorities in "recent months" of "inappropriate market timing" and other inappropriate or unlawful activity in the mutual fund industry. 68 Fed. Reg 74714-74715. The Release stated, "We are taking our first regulatory actions designed to curb the abusive practices recently uncovered and to prevent their recurrence." Id. at 74715 (Emphasis added.) In its explanation of the Compliance Rule, the Release stated that new Rule 38a-1, among other things, requires that investment companies adopt policies and procedures to monitor for circumstances that may necessitate the use of "fair value" prices and to establish criteria for determining when market quotations are "no longer reliable" for a particular portfolio securities. 68 Fed. Reg. at 74717-74718. The Compliance Rule is effective on February 5, 2004 and compliance with the rule is mandatory beginning on October 5, 2004. The language in the Compliance Rule Release appears to impose a binding, substantive requirement that changes the valuation methodology dictated by Section 2(a)(41)(B) of the ICA, with an impact on thousands of mutual funds and millions of investors, including DH2.

20. The Compliance Rule Release does not cite to any studies, data or other information developed by the SEC to explain the basis on which the SEC chose to adopt the Fair Value Rule, nor does it discuss other potential alternatives or the risks and benefits of the Fair Value Rule or other possible alternatives to address alleged "inappropriate market timing" or other mutual fund practices of concern to the SEC. After a fourteen month search and two FOIA appeals, looking through what it believes are the relevant files and speaking with the relevant personnel, the SEC Staff has formally advised that the agency has no significant internal documents available

11

regarding "market timing," "fair value pricing" or "active trading." Instead, the Compliance Rule Release and other recent statements of the SEC and its Staff make clear that the SEC has accepted without question or support the estimates of consultants in the employ of the data processing companies that sell fair valuation pricing services to mutual funds (the data processing companies and their consultants are the direct economic beneficiaries of the Fair Value Rule), and *ex parte* communications with the principal lobbying group of the mutual fund industry, as the justification for the new requirement. *See* 68 Fed. Reg. at 70404 fn.13 (Dec. 17, 2003); Smith, *Of Good Timing And Bad Timing And Prof. Zitzewitz,* THE WALL STREET JOURNAL, Dec. 9, 2003 at C-1 (Ex. Y); *Hearing on Initiatives to Address Concerns in the Mutual Fund Industry Before the Senate Subcommittee on Financial Management, the Budget and International Security, and Committee on Governmental Affairs, 108th Congress* (Nov. 3, 2003) (Statement of Paul Roye, Director, SEC Division of Investment Management) (Ex. X.) The estimates of "shareholder dilution" caused by "market timing" cited by the SEC as the reason for adopting the Fair Value Rule vary from one another by over 250%, press accounts have stated that the estimates vary from one another by 100-fold, and the consultants providing them concede these numbers are guesses. *See id.*; Prof. Henry Manne, *What Mutual Fund Scandal?,* WALL STREET JOURNAL, Jan. 8, 2004 (Ex. Y ); Alan Reynolds, *Hold on to That Mutual Fund,* WASHINGTON TIMES, Nov. 2, 2003 (Ex. Y).

21. On January 30, 2004, DH2 filed with the SEC an objection to and comment letter in respect of the Compliance Rule Release and the two other rules that were proposed at the SEC's December 3, 2003 meeting. (Ex. Z).

12

## PLAINTIFF'S CLAIMS FOR RELIEF

### COUNT I

### SEC FAILED TO COMPLY WITH THE
### APA'S NOTICE AND COMMENT REQUIREMENTS

22.  The issuance by SEC of the Fair Value Rule without providing notice and opportunity for interested persons to comment through submission of written data, views, or arguments addressing the significant issues raised by the rule violated Sections 10(b) and 10(c) of the APA, U.S.C. §§ 553(b), 553(c), and accordingly the Fair Value Rule is not validly promulgated.

### COUNT II

### ADOPTION OF THE FAIR VALUE RULE IS ARBITRARY,
### CAPRICIOUS, AN ABUSE OF DISCRETION

23.  Because the SEC failed to develop, review, consider or cite to any data or studies or comments in support of the Fair Value Rule, has stated formally after what it believes is a reasonable search under a lengthy FOIA request that it has no documents in its files regarding "fair value" "market timing" or "active trading," and failed to explain the basis on which the SEC chose to adopt the Fair Value Rule over other possible alternatives to address "inappropriate market timing" or other mutual fund practices of concern to the SEC, the SEC, in adopting the Fair Value Rule, has acted in a manner that is arbitrary, capricious, and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706 (2)(A).  Accordingly the Fair Value Rule is not validly promulgated.

13

## COUNT III

### THE FAIR VALUE RULE CONFLICTS WITH THE PLAIN LANGUAGE OF THE STATUTE, AND IS THEREFOR NOT IN ACCORDANCE WITH LAW

24. The Fair Value Rule purports to change the circumstances specified in Section 2(a)(41)(B) of the ICA under which fair value (i.e. estimates of the value) of portfolio securities will be substituted for actual market prices. Although the statutory language permits fair valuation only when market prices are not "readily available," the Fair Value Rule permits and requires the use of fair valuation when market prices are "readily available" but deemed to be "unreliable." Because the Fair Value Rule conflicts with the plain language of Section 2(a)(41) of the ICA, it is invalid under the APA and therefore void. 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

WHEREFORE, DH2 respectfully requests that this Court enter an order:

1. Declaring that, in promulgating the Fair Value Rule, defendant SEC has violated the APA and that the Fair Value Rule is therefore invalid, or alternatively, declaring that the Fair Value Rule is not a binding, substantive rule and cannot be imposed upon, or relied upon by, investment companies and insurance companies in valuing shares of mutual funds or interests in variable insurance products;

2. Declaring that the Fair Value Rule conflicts with the plain language of the ICA and is void;

3. Vacating the Fair Value Rule and provisions of the Compliance Rule Release that purport to impose it;

14

4. Enjoining the SEC from enforcing or otherwise directly or indirectly imposing or implementing the Fair Value Rule;

5. Awarding Plaintiff attorneys' fees and costs; and

6. Awarding Plaintiff any further relief that the court regards as just and proper.

Dated: January 30, 2004

Respectfully submitted,

_____

Attorneys for Plaintiff DH2, Inc.

Charles S. Bergen
George R. Dougherty
Marc S. Lauerman
GRIPPO & ELDEN, LLC
227 West Monroe, Suite 3600
Chicago, Illinois 60606
(312) 704-7700

OF COUNSEL:
David F. Freeman, Jr.
Martha L. Cochran
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D. C. 20004
(202) 942-5000

15

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT of ILLINOIS

| | |
|---|---|
| DH2, INC., an Illinois corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. |
| | ) |
| UNITED STATES SECURITIES AND | ) |
| EXCHANGE COMMISSION | ) |
| | ) |
| Defendant. | ) |

**EXHIBITS TO**
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**VOLUME 1 of 3**

Filed: January 30, 2004

Charles S. Bergen
George R. Dougherty
Marc S. Lauerman
GRIPPO & ELDEN, LLC
227 West Monroe, Suite 3600
Chicago, Illinois 60606
(312) 704-7700

OF COUNSEL:
David F. Freeman, Jr.
Martha L. Cochran
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D. C. 20004
(202) 942-5000

## TABLE OF EXHIBITS

| | |
|---|---|
| Tab A | SEC Release: Compliance Programs of Investment Companies and Investment Advisers Rule, 68 Fed. Reg. 74714 (Dec. 24, 2003) |
| Tab B | SEC Proposed Rule: Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70402 (Dec. 17, 2003) |
| Tab C | SEC Proposed Release: Compliance Programs of Investment Companies and Investment Advisers, 68 Fed. Reg. 7038 (Feb. 11, 2003) |
| Tab D | FOIA Letter from Grippo & Elden to SEC dated October 25, 2002 and November 25, 2002; SEC Letter in Response dated November 25, 2002 and December 18, 2002 |
| Tab E | FOIA Letter from Grippo & Elden to SEC dated October 25, 2002; SEC Letter in Response dated November 7, 2002 |
| Tab F | FOIA Letter from Grippo & Elden to SEC dated October 25, 2002 and November 25, 2002; SEC Letter in Response dated December 4, 2002 |
| Tab G | FOIA Letter from Grippo & Elden to SEC dated December 23, 2002; SEC Letters in Response dated January 24, 2003, February 7, 2003, and May 29, 2003 |
| Tab H | FOIA Letter from Grippo & Elden to SEC dated December 23, 2002; SEC Letters in Response dated January 24, 2003 and February 12, 2003 |
| Tab I | FOIA Letter from Grippo & Elden to SEC dated December 23, 2002 and February 12, 2002; SEC Letter in Response dated March 18, 2003 |
| Tab J | FOIA Letter from Grippo & Elden to SEC dated December 23, 2002 and February 12, 2003; SEC Letter in Response dated March 18, 2003 |
| Tab K | FOIA Letters from Grippo & Elden to SEC dated December 23, 2002, February 12, 2003 and February 21, 2003; SEC Letters in Response dated March 17, 2003 and April 29, 2003 |
| Tab L | FOIA Letter from Grippo & Elden to SEC dated December 23, 2002 and February 21, 2003; SEC Letters in Response dated March 17, 2003 and March 25, 2003 |
| Tab M | FOIA Letters from Grippo & Elden to SEC dated December 23, 2002, February 12, 2003 and March 5, 2003; SEC Letters in Response dated March 17, 2003, March 31, 2003 and November 17, 2003 |

41195v2

Tab N        FOIA Letter from Grippo & Elden to SEC dated December 23, 2002 and February 12, 2003; SEC Letters in Response dated March 17, 2003, March 31, 2003 and June 19, 2003

Tab O        FOIA Letter from Grippo & Elden to SEC dated December 23, 2002 and February 12, 2003; SEC Letters in Response dated March 17, 2003 and March 31, 2003

Tab P        FOIA Letter from Global Securities Information, Inc. to SEC dated December 6, 2002

Tab Q        Letter from SEC to Global Securities Information, Inc. dated December 13, 2002

Tab R        FOIA Appeal Letter from Global Securities Information, Inc. to SEC dated December 23, 2002

Tab S        SEC Letters responding to Global Securities Information, Inc.'s FOIA Appeal dated January 3, 2003 & March 12, 2003

Tab T        SEC Letter to Global Securities Information, Inc. dated June 12, 2003

Tab U        FOIA Appeal Letter from Global Securities Information, Inc. to SEC dated June 26, 2003

Tab V        SEC Letters responding to Global Securities Information, Inc. FOIA Appeal dated July 11, 2003 & January 23, 2004

Tab W        Statement of Paul Roye, Director, SEC Division of Investment Management at November 3, 2003 Senate Hearing on Initiatives to Address Concerns in the Mutual Fund Industry

Tab X        Opening Statement of Paul Roye, Director, Division of Investment Management, at SEC Open Meeting, December 3, 2003

Tab Y        Wall Street Journal article by Randall Smith titled "Of Good Timing And Bad Timing And Prof. Zitzewitz" dated December 9, 2003; Wall Street Journal column by Prof. Henry Manne titled "What Mutual Fund Scandal?" dated January 8, 2004; Washington Times column by Alan Reynolds titled "Hold on to That Mutual Fund" dated November 2, 2003

Tab Z        DH2, Inc. Comment and Objection Letter to SEC on Rulemakings (January 30, 2004)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** DH2, Inc., an Illinois corporation

**Defendant(s):** United States Securities and Exchange Commission

County of Residence: Cook

County of Residence:

Plaintiff's Atty:  Charles S. Bergan, George R. Dougherty, Marc S. Lauerman
Grippo & Elden, LLC
227 W. Monroe St., Suite 3600,
Chicago, IL 60606
(312) 704-7700

Defendant's Atty:

JUDGE SHADUR

**04C  0789**

MAGISTRATE JUDGE MASON

II. Basis of Jurisdiction:   **2. Federal Question** (U.S. *Government is defendant*)

III. Citizenship of Principal Parties
(Diversity Cases Only)
Plaintiff:- N/A
Defendant:- N/A

IV. Origin :   **1. Original Proceeding**

V. Nature of Suit:   **890 Other Statutory Actions**

VI. Cause of Action:   **Violation of 15 U.S.C. Sec. 551 et seq. and 15 U.S.C. Sec. 80a, et seq.**

VII. Requested in Complaint
Class Action:
Dollar Demand:
Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: ___1/30/04___

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**   Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the Matter of

DH2, Inc., an Illinois corporation, Plaintiff,

v.

United States Securities and Exchange Commission, Defendant.

JUDGE SHADUR

Case Number: **04C 0789**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff DH2, Inc.

MAGISTRATE JUDGE MASON

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Marc S. Lauerman | **NAME** Charles S. Bergen |
| **FIRM** Grippo & Elden, LLC | **FIRM** Same as A |
| **STREET ADDRESS** 227 W. Monroe St., Suite 3600 | **STREET ADDRESS** |
| **CITY/STATE/ZIP** Chicago, IL 60606 | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** (312) 704-7700 **FAX NUMBER** (312) 558-1195 | **TELEPHONE NUMBER** (312) 704-7700 **FAX NUMBER** (312) 558-1195 |
| **E-MAIL ADDRESS** mlauerman@grippoelden.com | **E-MAIL ADDRESS** cbergen@grippoelden.com |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6196672 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6186595 |
| **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ |
| **TRIAL ATTORNEY?** YES ☑ NO ☐ | **TRIAL ATTORNEY?** YES ☑ NO ☐ |
| | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** George R. Dougherty | **NAME** |
| **FIRM** Same as A | **FIRM** |
| **STREET ADDRESS** | **STREET ADDRESS** |
| **CITY/STATE/ZIP** | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** (312) 704-7700 **FAX NUMBER** (312) 558-1195 | **TELEPHONE NUMBER** **FAX NUMBER** |
| **E-MAIL ADDRESS** gdougherty@grippoelden.com | **E-MAIL ADDRESS** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6196945 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ |
| **TRIAL ATTORNEY?** YES ☑ NO ☐ | **TRIAL ATTORNEY?** YES ☐ NO ☐ |
| **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |

1 - 3

# Large document, please see case file.